## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOSE LUIS ALFARO MALO
LAURA LETICIA CARCIBA FALOMIR
Privada San Uriel Casa #5
Fraccionamiento Rincon del Cielo, Valle Dorado
Bahia De Banderas  63735
MEXICO

Civil Action No. _____

       Plaintiffs,

  v.

KEVIN MCALEENAN, SECRETARY, U.S.
DEPARTMENT OF HOMELAND SECURITY,
IN HIS OFFICIAL CAPACITY, 2707 Martin
Luther King, Jr. Ave. SE,
Washington, DC 20529; and

LEE FRANCIS CISSNA, DIRECTOR U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES, IN HIS OFFICIAL CAPACITY
20 Massachusetts Avenue, N.W.
Washington, DC  20529

       Defendants.

## COMPLAINT

## NATURE OF THE ACTION

1.      This case arises under the Immigration and Nationality Act ("INA"), 8 U.S.C. §

1101 *et seq*., and seeks this Court's review of agency action- under the Administrative Procedure

Act, 5 U.S.C. § 701 *et seq*., specifically- review of the rejections, more than a year after the time

of their filing, by Defendant L. Francis Cissna, Director, United States Citizenship and

Immigration Services ("Defendant"), dated August 17, 2018 of Plaintiff Jose Luis Alfaro Malo's

("Mr. Alfaro") and Laura Leticia Carcoba Falomir's ("Ms. Carcoba Falomir") (together

"Plaintiffs") applications for adjustment of status to that of lawful permanent residents, dated

July 31, 2017.  Plaintiffs further seek an order from the Court compelling Defendants to adjust

Plaintiffs' status forthwith to that of lawful permanent residents, 8 U.S.C. § 1151,1153, and

1181.

## PARTIES

2.      Plaintiff JOSE LUIS ALFARO MALO, is a citizen of Mexico, currently residing

in Mexico City, Mexico and is currently employed with Sports IQ Analytics Inc. ("Sports IQ"), a

provider of software solutions for the online gambling industry, as its Chief Data Officer.

3.      Plaintiff LAURA LETICIA CARCOBA FALOMIR is a citizen of Mexico,

currently residing in Mexico City, Mexico and is Mr. Alfaro's spouse. Mr. Alfaro and Ms.

Carcoba Falomir have three children, all of whom are citizens of the United States of America.

4.      Defendant KEVIN MCALEENAN is the Acting Secretary of the Department of

Homeland Security ("DHS"), and is sued in his official capacity.  He resides for official purposes

in the District of Columbia.

5.      Defendant LEE FRANCIS CISSNA  is the director of USCIS, a subordinate

component of DHS, and an "agency" within the meaning of the Administrative Procedure Act

("APA"), 5 U.S.C. § 551(1).   Director Cissna is sued in his official capacity.

6.      USCIS is responsible for administering the U.S. immigration system by

adjudicating requests for immigration benefits under applicable law including the I-485.

## JURISDICTION AND WAIVER OF SOVEREIGN IMMUNITY

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as a civil action arising

under the laws of the United States. This Court has jurisdiction to enter declaratory judgments

under 28 U.S.C. § 1361 and invalidate unlawful agency actions under 5 U.S.C. § 706, and to

review agency action arising under the Immigration and Nationality Act, 8 U.S.C. § 1101 et.

seq.,

8.      The United States has waived sovereign immunity under 5 U.S.C. § 702.

**VENUE**

9.      Venue is proper in this judicial district  pursuant to 28 U.S.C. § 1391(e) because Defendants are located in the District of Columbia.

**STANDING**

10.     The Plaintiff has Article III standing to sue.

11.     Article III standing requires a plaintiff to have:

    (a)     suffered an "injury in fact," *i.e.*, harm to a legally protected interest that is "concrete and particularized" and "actual or imminent";

    (b)     that is "fairly traceable to" the challenged conduct; and

    (c)     "likely to be redressed" by a favorable decision.

12.     Here, the Plaintiffs have suffered – and would further suffer – as a result of the failure of USCIS to observe its own publicly stated standard operating procedures and  timely reject their Forms I-485 filed at a time when an immigrant visa, and therefore adjustment of status, was unavailable to them, in reliance upon which they failed to file their Forms I-485 a mere two months later when an immigrant visa, and therefore adjustment of status, would in fact have been available to them.

13.     Defendants have the ability to remedy their failure by treating Plaintiffs' I-485 applications as timely filed and adjudicating them expeditiously in accordance with law.

**FACTUAL ALLEGATIONS**

*U.S. Immigration Overview*

14.     A person who is not a citizen or national of the United States is inadmissible to the United States unless they are admitted either as a "nonimmigrant" or an "immigrant."

15.     A non-immigrant includes a person who is admitted to the United States on a temporary basis under one of the categories defined in the Immigration and Nationality Act and its regulations. 8 U.S.C.  § 1184; 8 C.F.R. § 214.6.

16.     One such category of non-immigrant status is the "TN", which is available to Canadian and Mexican citizens engaged in professional activities recognized in treaties between the United States and Mexico and Canada.  8 CFR § 214.6.

17.     At all times relevant to this complaint, "Mathematician" (including Statistician) is among the occupations recognized under the trade treaties in force between Mexico and the U.S. as qualifying for TN nonimmigrant status.  *Id*.

18.     A person first admitted to the United States as a "nonimmigrant", entitled only to remain in the U.S. for a finite period of time, may later have their status "adjusted" to that of  "an alien lawfully admitted for permanent residence" if:

    (1)     the alien makes an application for such adjustment,

    (2)     the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and

    (3)     an immigrant visa is immediately available to him at the time his application is filed.

8 U.S. Code § 1255.

19.     An immigrant visa is a document authorizing admission of an individual to the U.S. on a permanent basis. 8 U.S.C. 1101(a)(16).

20.     As a general matter, the majority of immigrant visas are either "family-based", meaning they are based on the primary applicant's relationship with a U.S. Citizen or lawful permanent resident, or "employment-based", which are based on the occupation and/or job position of the primary applicant.

21.     Before a foreign national may obtain an employment-based immigrant visa the foreign national must demonstrate eligibility in one of five categories found at 8 U.S. Code § 1153(b) (Allocation of immigrant visas - Preference allocation for Employment-Based Immigrants).

22.     The second of those categories is found at 8 U.S. Code § 1153(b)(2), and is reserved for "aliens who are members of the professions holding advanced degrees or aliens of exceptional ability", further described as:

> qualified immigrants who are members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural or educational interests, or welfare of the United States, and whose services in the sciences, arts, professions, or business are sought by an employer in the United States.

23.     Immigrant visas issued pursuant to the above are designated by USCIS as employment-based second preference or EB-2 visas.

24.     The number of visas that can be issued in any given year in any category under 8 U.S.C. § 1153(b) limited as to each country of birth by rules found in 8 U.S.C. § 1151 and 8 U.S.C. § 1153 itself.

25.     A U.S.-based employer seeking to have a foreign national employee permanently admitted or authorized to remain in the United States must first seek certification from the U.S. Department of Labor as required under 8 U.S.C. § 1182(a)(5)(A), unless exempt.

26.     Once labor certification has been granted, the petitioning employer must complete a form entitled the "Immigrant Petition for Alien Worker", which is classified in USCIS's alphanumeric document index as Form I-140.

27.     Once granted, the I-140 establishes the eligibility of the foreign national for the desired benefit.

28.     If the foreign national is already in the U.S. pursuant to a non-immigrant benefit, the foreign national may file an application for "adjustment of status", which if granted would result in the foreign national becoming a lawful permanent resident of the United States.

29.     The application for adjustment or change of status is classified in the alphanumeric document index established by USCIS as "Form I-485."

30.     If a foreign national is abroad, they must apply to the U.S. Department of State ("DOS") for a visa authorizing them to come to the United States using the applicable form issued by DOS.

31.     As the annual allocation of immigrant visas for nationals of any given country in most visa categories is limited, there is often a backlog for nationals of certain countries in particular categories.

32.     To alert eligible foreign nationals to when they may apply for either adjustment of status or for immigrant visas, the  U.S. Department of State, Bureau of Consular Affairs issues a bulletin, known as the "visa bulletin", advising various classes of potential immigrants from particular countries that either their category is current, in which case the category is marked with a "C" or that their category is backlogged for nationals of their country, in which case the bulletin lists the latest "priority date" which an applicant can have.

33.     The priority date is a date which establishes the immigrant's place in the queue to be allowed to seek permanent residence and is determined by the occurrence of certain milestones in the visa application process.

34.     In the case of an applicant for an EB-2 visa, the individual's priority date is determined by the date when the individual's application for labor certification was received by the Department of Labor.

35.     Based on the visa bulletin, only those individuals who are either in a category marked "C" or who have priority dates no later than the priority date listed in the bulletin for their category, may apply for either an immigrant visa or adjustment of status.

36.     The Department of State issues the visa bulletin early in the month prior to the month for which the bulletin is effective.

37.     Where a foreign national is present in the United States under a lawful non-immigrant status, they are permitted to file an I-485 with USCIS when the visa bulletin indicates that immigrant visa numbers are available.

38.     Forms I-485 filed along with Form I-140 are filed at the USCIS Lockbox in Dallas, Texas.

39.     Once filed with a USCIS Lockbox facility, lockbox personnel conduct an initial screening.

40.     In accordance with USCIS Standard Operating Procedures:

(i)     USCIS will consider a benefit request received and will record the receipt date as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format.

(ii)    A benefit request which is rejected will not retain a filing date. A benefit request will be rejected if it is not:

(A)    Signed with valid signature;

(B)    Executed;

(C)    Filed in compliance with the regulations governing the filing of the specific application, petition, form, or request; and

41.     Ordinary USCIS procedure is that applications not meeting the above criteria are rejected immediately and returned to the applicant along with any fee submitted.

**Jose Alfaro's Professional Background**

42.     Mr. Alfaro is one of the top experts in the world in the field of predictive sports modelling.

43.     Mr. Alfaro has created unique and original statistical and mathematical models that correctly approximate the real mathematical framework of each individual sport, so that these models can generate real time probabilities for contests in the following leagues: National Football League, National Basketball Association, Major League Baseball, National Hockey League, Women's National Basketball Association, NCAA Basketball, NCAA Football, Canadian Football League and Minor League Baseball (Mexican, International and Pacific leagues).

44.     Mr. Alfaro has created and developed games for instant lottery companies.

45.     His models have been consulted by government lotteries in other countries.

46.     Mr. Alfaro's undergraduate thesis at the Instituto Tecnologico Autonomo de Mexico, was entitled "Project to Establish an Instant Lottery System in Mexico for the National Lottery." Mr. Alfaro's thesis work was used as the foundation for the National Government Lottery in Mexico when it was created several years later.

47.     Mr. Alfaro is a member of Mensa in the United States. Mensa, known as the "high IQ society", is a forum for intellectual exchange among its members. Membership is open to persons with intelligence quotient scores in the upper two percent of the general population.

48.     Mr. Alfaro was also awarded a full scholarship for graduate school at Tulane University based on his aforementioned undergraduate thesis and his Graduate Management Admission (GMAT) scores.

49.     Mr. Alfaro declined the offered scholarship because of work opportunities that immediately became available to him in Mexico because of his unique abilities in his field.

50.     From 1991 to 2010, when Mr. Alfaro came to the U.S. pursuant to an F-1 Student visa, Mr. Alfaro held a series of positions in Mexico and Canada, all growing out of his abilities in the field of statistics and probabilities.

**Plaintiffs' Family Situation**

51.     Mr. Alfaro has been married to Ms. Carcoba Falomir since February 12, 1994.

52.     They have three children, all of whom were born in Las Vegas, Nevada and are United States citizens: Jose Luis Alfaro-Carcoba, Age 19; Daniel Alfaro-Carcoba, Age 13; and Mariana Alfaro-Carcoba, Age 13.

53.     All three of Mr. Alfaro's children have autism.

54.     Jose Luis is by far the lowest functioning of Plaintiffs' children.  While in the U.S., with the help of the school system and all the therapies he was receiving there, episodes of aggressiveness were minimal and controllable.

55.     Daniel is in the middle of the autism spectrum in terms of his level of function. Daniel was finally starting to talk after thirteen years of constant therapies and efforts.  He was using his IPad to communicate and Plaintiffs were starting to be able to manage his frustration because of his lack of communication.

56.     Mariana is very high functioning.   Mariana, after many years of therapy, from not being able to speak and experiencing behavior issues, was finally able to  be transferred from self-contained classrooms and programs to a more general learning program.  Mariana was hampered by many years of not learning the same things as other children, but thanks to her great intelligent quotient and tenacity, aided by therapies and the school system, in the last 2 or 3

years,  she had almost caught up to her same age peers in academic terms and even surpassed them in some.

57.     When Mr. Alfaro was admitted to the United States as an F-1 student in 2010, both his wife and his children moved along with him to the U.S.

58.     Mr. Alfaro and his family established residence in the Las Vegas, Nevada area, where they remained until their departure from the U.S. following the rejection of his I-485.

**Plaintiffs' Relevant Travel and Visa History**

59.     Mr. Alfaro, Ms. Carcoba Falomir, and their children have spent a significant part of their lives visiting and ultimately living as lawful non-immigrants in the United States.

60.     From the early 1970's until 2015, Mr. Alfaro held B-2 visas at various times, often traveling to a vacation condominium owned by his parents in Las Vegas, Nevada.

61.     Based on his admission to two separate Masters programs at the University of Nevada Las Vegas ("UNLV"), Mr. Alfaro secured an F-1 student visa which he held until April 2013.

62.     Ms. Carcoba Falomir was admitted at roughly the same time as the spouse of F-1 student visa holder.

63.     In May 2013, Mr. Alfaro was granted a change of his status from an F-1 student visa to a TN-2 visa.

64.     At the same time, Ms. Carcoba Falomir was granted a change of her status to that of a spouse of a TN visa holder, known as TD.

65.     Mr. Alfaro lawfully remained in TN-2 status until January 11, 2018.

66.     Mr. Alfaro began working as a statistician at Corcom beginning in January 2013. Corcom later became Don Best Sports.

67.     Don Best Sports retained the services of an immigration law firm, Neil Weinrib & Associates ("the Weinrib firm") to handle all immigration matters arising out of Mr. Alfaro's employment with Don Best.

68.     While Mr. Alfaro was working at Don Best Sports, Don Best Sports initiated the process to apply for permanent residence for Mr. Alfaro and Ms. Carcoba Falomir

69.     In furtherance of this process, on January 30, 2017 Don Best Sports applied for a labor certification with the Department of Labor, Office for Foreign Labor Certification, thereby establishing Mr. Alfaro's priority date for subsequent I-140 filings.

**The Error in Filing Mr. Alfaro's I-485**

70.     After the January 30 labor certification, Mr. Alfaro began working with attorneys at the Weinrib firm to prepare Forms I-140 concurrently with Forms I-485 to enable Mr. Alfaro and his wife to adjust their status to that of lawful permanent residents.

71.     Following some delay by the Weinrib firm in beginning the process of preparing the I-140 and I-485 filings, Mr. Alfaro became concerned about his ability to travel abroad, and in April 2017 Mr. Alfaro pressed attorneys at the Weinrib firm to move quickly to assemble his immigration paperwork.

72.     Mr. Alfaro's I-140, and his and Ms. Carcoba Falomir's Forms I-485, as well as all necessary supporting documentation, were ready by July 7, 2017, when they were signed by Mr. Alfaro and Ms. Carcoba Falomir.

73.     The July 2017 visa bulletin marked the "final action date" for beneficiaries of approved EB-2 petitions who were born in Mexico as "C", meaning an immigrant visa would have been immediately available to Mr. Alfaro and Ms. Carcoba Falomir.

74.     On July 11, 2017, the Department of State issued the August 2017 Visa Bulletin.

75.    The August 2017 Visa Bulletin listed a "final action date" for the EB-2 category of April 1, 2015.

76.    Because Mr. Alfaro's priority date was in January 2017, I-485 adjustment was available to neither him nor his wife in August 2017.

77.    Nevertheless, the attorneys mailed Mr. Alfaro's I-485 on July 31, 2017 as a result of which it was received by USCIS on August 7, 2017, meaning that neither Mr. Alfaro nor Ms. Carcoba Falomir would be able to adjust their status during the month of August.

78.    USCIS Standard Operating Procedures specifically directs lockbox personnel to determine whether a visa is available and to route the application for rejection if no visa is available.

79.    Ordinarily, USCIS would **upon receipt** immediately reject an I-485 petition filed by an individual whose priority date meant that no visa would be available.

80.    Inexplicably, USCIS **took no action on Plaintiffs' applications for over one year**.

81.    In the meantime, Mr. Alfaro resigned his position at Don Best Sports and began working with his current employer SportsIQ, a startup company engaged in the sports predictive modeling business.

82.    Mr. Alfaro's change of employer would not have affected his eligibility for lawful permanent residence.  8 U.S.C. § 1154(j).

83.    On August 17, 2018, USCIS issued notices denying Mr. Alfaro and Ms. Carcoba Falomir' s adjustment of status applications.

84.     Notwithstanding,  USCIS did not mail its "Notices of Decision" communicating the rejection of the I-485 until nearly one month later, on September 11, 2018, as evidenced by the post date on the envelope for one of the notices.

85.     USCIS' over one year delay in communicating that it was rejecting Mr. Alfaro and Ms. Carcoba Falomir' s  Forms I-485 needlessly prevented them from being able to easily remedy the consequences of their attorney's error, and instead resulted in their having to start from scratch.

86.     Although the final action date for EB-2 petitions on behalf of Mexican nationals was not current in both August and September 2017, the final action date again became current in all months from October 2017 through August 2018.

87.     Had Mr. Alfaro and Ms. Carcoba Falomir been timely notified of the rejection of their I-485's they would have been able to immediately refile in advance of the expiration of Mr. Alfaro's TN visa in January 2018.

88.     Moreover, if necessary, Mr. Alfaro would have been able to seek an extension of his TN visa upon its expiration in January if for some reason he had been unable to file an I-485 prior to that time.

89.     Because of USCIS' departure from its own standard operating procedures, Mr. Alfaro and his family unnecessarily had to return to Mexico.

90.     This caused great harm to Mr. Alfaro as well as his wife, children (all of whom are U.S. citizens), and his new employer, Sports IQ.

91.      Because his U.S. citizen son, Jose Luis, now lacks needed services that were readily available to him in Las Vegas, his previously controlled aggressive behavior is back to almost a daily occurrence, and it has become very difficult to get him out into social

environments.  Jose Luis has been deeply affected by the change in environment.  Mr. Alfaro and

Ms. Carcoba Falomir have been unable to find any services for him in Mexico and as a

consequence he has regressed in several areas.   Relatedly, it has become very difficult for Mr.

Alfaro and Ms. Carcoba to make Jose Luis maintain proper schedules, from sleeping patterns to

hygiene, or regular day-to-day activities.

92.      Daniel has been affected the most, as he misses his U.S. environment. The move

has hampered his development, as he now he finds himself surrounded by people who do not

understand him, does not understand Spanish, and finds himself in an unfamiliar environment

He is constantly frustrated, requiring his parents' presence at all times in order to satisfy his

needs because he cannot communicate.  These circumstances have caused behavioral issues,

which when compounded by the absolute lack of services for him, has put him in a downward

spiral, which if it persists, will undermine all the progress he made in the U.S. to overcome his

disabilities and could potentially harm him for the rest of his life.

93.      Mr. Alfaro and Ms. Carcoba Falomir are VERY concerned about Daniel.

94.      Mariana now finds herself in an unwelcoming environment.  She is unable to fit

in into the Mexican system, with no school services available that could be tailored to her needs.

Despite best efforts, her parents have been unable to find a suitable environment for her and have

had to revert to using private tutors of inadequate quality to compensate for what she is missing

from the U.S. school system.  This is in itself a regression because it leaves her without a normal

socially healthy environment, and could prove to be a tough obstacle for her integration back into

normal society and possibly worse, make her incapable of managing social situations, like going

to college, etc.

95.     Mr. Alfaro has been working for SportsIQ from his new home in Mexico, a scenario which is acceptable for the short-term but which in untenable over the long-term.  The company has to shoulder a lot of the legal costs caused by Mr. Alfaro's immigration issues, along with extra costs associated with having Mr. Alfaro working outside the U.S.

96.     Moreover, the growth of SportsIQ as a company was delayed, during the period following the rejection of Mr. Alfaro's I-485, as Mr. Alfaro was unable to work until he was fully relocated in Mexico and able again to work.

97.     Going forward, it is untenable for SportsIQ to have Mr. Alfaro work in Mexico with its many inherent risks,  from personal risks, such as living in a high crime country, to infrastructure risks, like constant power failures, communication disruptions, etc.

98.     Finally, Mr. Alfaro's inability to attend client meetings, events or industry shows, has an adverse effect on the company's ability to showcase its products, since one of the main developers is unable to participate in person.

## COUNT ONE
## Violation of the Administrative Procedure Act
## 5 U.S.C. § 701, *et seq.*

99.     Plaintiff re-alleges and incorporates herein by reference, as if fully set forth herein, the allegations in paragraphs 1 - 98 above.

100.     Plaintiff is entitled to review by this Court pursuant to 5 U.S.C. §§ 701-706.

101.     A reviewing court shall "hold unlawful and set aside agency action . . . found to be -- arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

102.     Defendants waited thirteen months to reject the Plaintiff's I-485 application, rather than rejecting the application immediately per Defendants' ordinary procedures.

103.     Because Defendants did not immediately reject Mr. Alfaro's I-485 application, Mr. Alfaro lost the opportunity to renew his TN visa, an option which would have been fully available.

104.     Mr. Alfaro and Ms. Carcoba Falomir also lost the opportunity to file an I-485 at time when a visa was available, a circumstance which would have occurred as early as October 1, 2017.

105.     Defendants' failure to timely reject Plaintiffs' I-485 petitions constitutes agency action which is arbitrary, capricious, and otherwise not in accordance the law in violation of the APA. 5 U.S.C. § 706(2)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

A.     Declare that Defendant's failure to promptly reject Mr. Alfaro's I-485 petition was arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A); and

B.     Direct Defendants to reinstate the rejected I-485 applications for Mr. Alfaro and Ms. Carcoba Falomir, with filing dates of October 1, 2018 and to grant those applications immediately, and grant parole under 8 U.S.C. § 1182(d)(5), allowing Mr. Alfaro and Ms. Carcoba Falomir to enter the U.S. in order to adjust their status; or

C.     In the alternative, immediately grant Mr. Alfaro a TN visa and grant Ms. Carcoba Falomir a derivative TN-2 visa.

DATED:  May 2, 2019                             Respectfully submitted,

                                                SEYFARTH SHAW LLP


                                                By: */s/ Samantha L. Brooks*
                                                    Samantha L. Brooks, DC Bar 1033641
                                                    sbrooks@seyfarth.com
                                                    Leon Rodriguez, DC Bar 476381
                                                    lerodriguez@seyfarth.com
                                                    SEYFARTH SHAW LLP
                                                    975 F Street, N.W.
                                                    Washington, DC  20004-1454
                                                    Telephone: (202) 463-2400
                                                    Facsimile:  (202) 828-5393

                                                    Attorneys for Plaintiffs